IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

STACIE NICHOLE DUNN                                              PLAINTIFF

VS                              CIVIL ACTION NO.: 3:15-CV-352-DPJ-FKB

LAUDERDALE COUNTY, AND
WILLIAM D. (BILLY) SOLLIE IN HIS
OFFICIAL CAPACITY AS SHERIFF OF
LAUDERDALE COUNTY, MISSISSIPPI, AND
JOHN DOE DEFENDANTS ONE THROUGH TEN                    DEFENDANTS

# EXHIBIT 7:

# DEPOSITION (EXCERPT) OF KEN DELANEY

Page 1

IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


STACIE NICHOLE DUNN                                    PLAINTIFF

VS.               CIVIL ACTION NO. 3:15-CV-352-DPJ-FKB

LAUDERDALE COUNTY, KEN DULANEY,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A LAUDERDALE COUNTY
SHERIFF'S DEPUTY, AND WILLIAM D. (BILLY)
SOLLIE IN HIS OFFICIAL CAPACITY AS
SHERIFF OF LAUDERDALE COUNTY, MISSISSIPPI
AND JOHN DOE DEFENDANTS ONE THROUGH TEN        DEFENDANTS


*************************************

ORAL DEPOSITION OF

KEN DULANEY

JANUARY 24, 2017

Volume 1 of 1

*************************************


        ORAL DEPOSITION OF KEN DULANEY, produced as a

witness at the instance of the Plaintiff, and duly sworn,

was taken in the above-styled and -numbered cause on the

24th day of January, 2017, before Megan Reeves, CCR in

and for the State of Mississippi, reported by machine

shorthand, at the offices of Barry, Thaggard, May &

Bailey, LLP, 505 Constitution Avenue, in the City of

Meridian, State of Mississippi.

Ken Dulaney                                     January 24, 2017

Page 10

1      Q     Was that offshore or onshore?

2      A     Offshore.

3      Q     When did you first receive any training

4    toward a law enforcement career?

5      A     I'm sure there was some in-service

6    training during that first year.  I went to the

7    academy in January of 1993.

8      Q     Were you employed in a -- as a law

9    enforcement officer before going to the academy?

10     A     Yeah.  Because at the time you had

11   12 months from the time you were hired to be in the

12   academy.  So I was employed during that time.

13     Q     All right.  So by what agency?

14     A     At that time it was the University Medical

15   Center Police Department, and I believe at the time

16   I was also working part time for Copiah County

17   Sheriff's Office.

18     Q     So you were working full time at Noble

19   Drilling and then went to work for the University?

20     A     Yes.

21     Q     Okay.  And contemporaneously you were

22   working part time for the sheriff?

23     A     Yeah.

24     Q     Okay.

25     A     Well, it was -- at some point during that

Ken Dulaney                                    January 24, 2017

1    time, it was reserves and then at some point part

2    time.

3         Q    Okay.  Started out as reserve and then

4    transitioned into being a part-time officer?

5         A    I just filled in part time when they

6    needed help.

7         Q    Okay.  Can you -- do you recall what years

8    you were with the Copiah County -- Copiah County SO?

9         A    Not exactly.

10        Q    But it --

11        A    I went to work for them full time in, I'm

12   thinking, '94.

13        Q    Okay.  What did -- when did you complete

14   your training at the academy?

15        A    I think in March of '93.

16        Q    Okay.  And what did you do between the

17   time you graduated from the academy and the time you

18   started full time with Copiah Sheriff?

19        A    Worked for University.

20        Q    Okay.  Okay.  Who was the sheriff in

21   Copiah at the time?

22        A    I'm trying to think if he was still in

23   office.  I think at the time I got hired full time,

24   it was Bob Clower.

25        Q    Okay.  And did you work under another

Ken Dulaney                                    January 24, 2017

Page 12

1   sheriff after Sheriff Clower?

2        A    No.  When Sheriff Clower lost the

3   election, I went to work for the Vicksburg Police

4   Department.

5        Q    Okay.  Before we leave the topic of

6   Copiah, what were your duties with the Copiah SO?

7        A    I was a road deputy and, I guess you could

8   say, part-time investigator.

9        Q    Okay.  And when did you go to work for

10  Vicksburg PD?

11       A    I want to say it was January of '95.

12       Q    In what capacity?

13       A    Patrolman.

14       Q    Okay.  Who was your supervisor at

15  Vicksburg?

16       A    My shift commander was Robert -- no.  Not

17  Robert.  Jack Dowe.

18       Q    Dow, D-O-W?

19       A    D-O-W-E.

20       Q    Okay.  And how long were you with

21  Vicksburg?

22       A    Until around the first of 2000.

23       Q    So nearly five years?

24       A    Yeah.

25       Q    Were you a patrolman throughout that

Ken Dulaney                                              January 24, 2017

Page 13

1    entire five-year period?

2         A    Yes.

3         Q    When you left Vicksburg Police Department

4    in 2000, where did you go to work?

5         A    Lauderdale County Sheriff's Department.

6         Q    Okay.  What was your reason for leaving

7    Vicksburg?

8         A    A change of jobs, getting out of

9    Vicksburg.  I was -- my wife and I had had some

10   problems.  We had separated and got back together,

11   and we was trying to make a new start.

12        Q    Okay.  Okay.  And when you started with

13   the Lauderdale County Sheriff, in what -- what were

14   your duties?

15        A    Road deputy.

16        Q    Okay.  How long did you serve as a road

17   deputy?

18        A    Promoted to shift supervisor, I think, in

19   2002.  I believe that's right.

20        Q    Okay.

21        A    I worked in that capacity until, I want to

22   say, October of 2004.

23        Q    Okay.  Where did you go in October of

24   2004?

25        A    Interstate interdiction.

Ken Dulaney                                    January 24, 2017

Page 14

1        Q     Is that as a deputy?

2        A     Yeah.  Well, I was a deputy assigned to

3    work interstate drug interdiction, assigned under

4    the East Mississippi Drug Task Force.

5        Q     Oh, okay.  So did you report to the -- to

6    the commander of the task force?

7        A     Yes.

8        Q     Okay.  Is he called the commander or is he

9    agent in charge, or what do y'all call him?

10       A     Commander.

11       Q     Commander.  Okay.  Who was the --

12       A     Actually, the major over the task force.

13       Q     Who was the major in command at that time?

14       A     Steve Spears.

15       Q     Okay.  At some point didn't you train as a

16   K-9 officer?

17       A     Yes.

18       Q     When was that?

19       A     The first dog, I believe, was in ninety --

20   '95 or '96.

21       Q     Okay.  So you were --

22       A     I'm not sure.

23       Q     So you were a K-9 officer before you came

24   to Meridian?

25       A     No.  I'm sorry.  2005, 2006.

Ken Dulaney                                    January 24, 2017

Page 15

1        Q     Oh, okay.

2        A     Somewhere around in there.

3        Q     Okay.  Okay.  So you trained as a K-9

4   officer when you were with the interstate

5   interdiction unit?

6        A     That's correct.

7        Q     Okay.  All right.  And then did you

8   transition from there into being a regular agent

9   with the task force?

10       A     Yes.

11       Q     Okay.  When approximately was that?

12       A     I think it was the end of 2012, I think.

13       Q     Okay.

14       A     That's approximately.  I don't know the --

15       Q     I won't hold you to it specifically.  I'm

16   just trying to get a -- get a frame of reference.

17   Was Major Spears still in command at that time or

18   did you have a new commander?

19       A      I honestly can't remember whether Steve

20   Spears was still there or whether Greg was already

21   the commander.

22       Q     Okay.  So it was either Major Spears or

23   Major Lea, Greg Lea?

24       A     Yes.

25       Q     And Greg Lea is L-E-A; isn't it?

Ken Dulaney                                          January 24, 2017

Page 16

1       A    Yes.

2       Q    Okay.  All right.  What were your duties

3   and responsibilities as a task force agent?

4       A    Once I transferred back to the task force

5   office?

6       Q    Yeah.

7       A    Narcotics investigator.

8       Q    Okay.  All right.  Now, I'm sure you're

9   aware that the event that we're here to talk about

10  today occurred on October the 2nd, 2013.

11      A    Yes.

12      Q    Do you recall that?

13      A    (Witness nodding head.)

14      Q    Okay.  Were you serving as a narcotics

15  investigator at that time?

16      A    I was.

17      Q    Okay.  And I understand from talking to

18  the sheriff earlier today that throughout this

19  period of time that you were serving as -- when you

20  were attached to the task force that you also had

21  some duties and responsibilities for firearms

22  training; is that correct?

23      A    That's correct.

24      Q    Okay.  Well, tell me about that, please.

25      A    I was a firearms instructor before I left

Ken Dulaney                                    January 24, 2017

Page 17

1   Vicksburg.  I came to Lauderdale County and I --

2   shortly after I got here, I was assigned as a

3   firearms instructor here.

4        Q    Okay.

5        A    Over the course of however many years,

6   I've got, I believe, five integrated law enforcement

7   instructor certifications.

8        Q    Okay.  Are those annual certifications?

9        A    They're every three years.

10       Q    Okay.

11       A    Well, they renew every three years.

12       Q    Okay.

13       A    And then within that three years, you

14  have -- I believe it's twenty -- 21 hours,

15  continuing education hours, that can be

16  firearms-related training within that three years.

17       Q    Okay.

18       A    That renews the --

19       Q    Where --

20       A    -- certification.

21       Q    Oh, excuse me for cutting you off.  Where

22  do you -- where did you obtain the 21 hours of

23  continuing education?

24       A    It can be any firearms-related school or

25  training.

Ken Dulaney                                    January 24, 2017

Page 18

1      Q    Okay.  Is it -- can it be within your own
2  agency or do you have to go to a school?
3      A    You go to a school.
4      Q    Okay.
5      A    It's not in-service training.
6      Q    Okay.  So you --
7      A    Part of it -- and part of it was done as
8  they came up for renewal.  I just got another NRA
9  instructor school that, in turn, renewed it.
10     Q    Okay.  So you could use the -- the NRA
11 instructor school to renew could qualify -- could
12 satisfy your 21-year -- 21 hours of continuing --
13     A    Yes.
14     Q    -- education requirements?
15     A    Yes.
16     Q    Okay.  All right.  What other types of
17 courses did you attend -- firearms-related courses
18 did you attend other than NRA classes?
19     A    Other than NRA classes?  Specifically, I
20 can't remember.  I mean, you know, my school is
21 dating back to, I think, 1998, is when I got the
22 first --
23     Q    Okay.
24     A    -- instructing -- instructor
25 certification.

Ken Dulaney                                    January 24, 2017

Page 19

1       Q      But you did go to some not in-service

2    training classes?

3       A      Within the -- within those time periods,

4    yes.

5       Q      Okay.  Do you recall where you went?

6       A      Not specifically.

7       Q      Or what organization provided the training

8    to you?

9       A      Not specifically.

10      Q      Okay.  What, if any, training did you have

11   with regard to either planning or conducting raids

12   or warrant services?

13      A      High-risk raid planning and execution.  I

14   believe that was at RTCA, but that's the only one I

15   specifically remember.

16      Q      Okay.  And that's the Regional Counterdrug

17   Training Academy?

18      A      Yes.

19      Q      Okay.  And do you recall how many hours

20   that was?

21      A      I do not.

22      Q      Okay.  And do you recall approximately

23   when you attended that course?

24      A      I don't.

25      Q      Okay.  With regard to the events that

Ken Dulaney                                          January 24, 2017

                                                          Page 20

1    occurred on October the 3rd, 2013, were you involved

2    in any of the intelligence gathering that led to the

3    raid that occurred on that date?

4         A    I was not the case agent on the buy and I

5    was not the case agent on the search warrant.  Now,

6    did I have some -- some part in the buy, I probably

7    did.  I can't remember specifically, but I was not

8    the case agent.

9         Q    Okay.  Other than the -- other than the

10   controlled buy that occurred a day or so before the

11   raid, was there any intelligence gathered either on

12   the subject of the warrant or on the premises that

13   was to be searched?

14        A    Going strictly by memory, and that's

15   three-and-a-half years old, there was an informant

16   that called and provided me some information to

17   relay to Major Greg Lea.  For whatever reason, he

18   always called me to get ahold of Greg.  I took that

19   information; I passed it on to Major Lea.  Past

20   that, I -- I don't remember.

21        Q    Is he a -- was he a confidential

22   informant?

23        A    Yeah.

24        Q    Was he a coded informant?

25        A    He was.

Ken Dulaney                                    January 24, 2017

Page 21

1       Q    Okay.  Is he still a coded informant, as
2   you -- as far as you know?
3       A    As far as I know, he is.
4       Q    Okay.  Do you recall -- I'm not asking you
5   to identify him, but do you know who he was?  Could
6   you identify him if a court directed you to?
7       A    I know who the informant was.  Yes.
8       Q    Okay.  What information did the informant
9   provide you?
10      A    Basically the presence of a firearm inside
11  the residence, and I want to say he said some
12  stolen, or what he believed to be stolen,
13  pharmaceuticals hidden at the residence.
14      Q    What, if any, information did you have at
15  the time that led you to deem this confidential
16  informant as a reliable source?
17      A    (No response.)
18      Q    If you did.  Did you deem him to be a
19  reliable source?
20      A    I did based on information he had provided
21  in the past.
22      Q    How often had he provided information to
23  you in the past?
24      A    He was not my informant, and I couldn't
25  give you an accurate answer to that.

Ken Dulaney                                    January 24, 2017

Page 22

1      Q    Had he ever provided information to you

2  prior to the events that you've just described to

3  me?

4      A    In the same manner, he would call me to

5  get ahold of Greg and I would pass the information

6  to Greg, but specifically I can't remember.

7      Q    Okay.  I'm not sure I understand.  Was

8  this confidential informant calling you and then

9  giving you information that you gave to Major Lea,

10 or was he just calling you and you put him in

11 contact with Major Lea?

12     A    He called and -- he had called Major Lea

13 on different occasions.  Occasionally, he would call

14 me.  He would give me information and I would pass

15 it on to Major Lea.  Now, whether he, in turn,

16 contacted the informant back, I don't know that.

17 But he called, this is what he wanted.

18     Q    Okay.

19     A    I gave him that information.  Now, where

20 it went after that...

21     Q    Okay.  It sounds to me -- and don't let me

22 mischaracterize this -- but am I correct in my

23 assumption that you didn't evaluate the reliability

24 or value of the information that was given to you by

25 the confidential informant?

Ken Dulaney                                          January 24, 2017

                                                              Page 23

1              MR. WOLF:  I'm going to object to the form

2         of the question.  Answer if you can.

3         A    I was party to deals that the -- that the

4    informant had completed with Major Lea on previous

5    occasions.  So in my -- I had personal knowledge

6    that he had provided information or performed tasks

7    that had proved to be credible.

8    BY MR. MALTA:

9         Q    Okay.  Had you used him as a -- to make

10   controlled buys in -- prior to October the 2nd,

11   2013, or had the task force, more correctly?

12        A    The task force had.

13        Q    And you were aware of that?

14        A    I was.

15        Q    Okay.  How often had you -- or are you

16   aware that the force employed that particular

17   confidential informant in that manner?

18        A    I would say several times.  I couldn't

19   give you an exact number.

20        Q    Would several be as many as half a dozen?

21        A    I really don't recall.

22        Q    Okay.

23        A    There again, he was not my informant.

24        Q    Okay.  Was he a different informant from

25   the informant who was used for the controlled buy on

Ken Dulaney                                        January 24, 2017

Page 24

1    the individual who was the subject of the warrant

2    that's at issue in this lawsuit?

3        A    I'm trying to remember who did the -- yes.

4    He was.

5        Q    Okay.  And I believe I understood you to

6    testify earlier that you were not involved in -- in

7    that particular buy operation; correct?  The one

8    than predicated the search warrant.

9        A    Sir, I was not the case agent.  I'm not

10   going to tell you I wasn't there because I probably

11   was --

12       Q    Okay.

13       A    -- whether it was just in a security role

14   or whatever.  But I was probably there but I was not

15   the case agent.

16       Q    Okay.  Was there any intelligence gathered

17   by surveillance or any other means on the premises

18   prior to the execution of the search warrant on

19   October the 2nd, 2013?

20       A    I know there were -- I believe it was the

21   day of the warrant, and there were pictures taken of

22   the residence, and I was there for that.

23       Q    Who took those photographs?

24       A    I want to say it was -- I want to say it

25   was myself and Major Lea.  Now, who actually took

Ken Dulaney                                        January 24, 2017

Page 25

1    the pictures, I don't recall, but...

2        Q     All right.  Now, are you talking about the

3    photographs that were taken after the warrant was

4    executed?

5        A     No.  No.  Prior to the warrant being

6    executed.

7        Q     Okay.  So these were photographs of the

8    exterior of the --

9        A     Yes.

10       Q     -- building?  Okay.

11       A     The -- any information coming on the

12   interior of the vehicle -- or interior of the

13   building.  The informant that conducted the buy on

14   the previous date provided a layout as best he could

15   of what the inside of the residence looked like.  I

16   cannot remember -- because a lot of the places we

17   deal with, officers have been to or in in the past.

18   I can't remember whether that was the case or not,

19   but there was a description of the inside of the

20   residence --

21       Q     Okay.

22       A     -- provided by the confidential informant

23   that conducted the controlled purchase.

24       Q     Was that actually drafted out, diagrammed

25   out?

Ken Dulaney                                    January 24, 2017

Page 26

1       A     I believe it was.

2       Q     Do you recall who did that?

3       A     I don't.

4       Q     Do you know if that document still exists?

5       A     I do not.

6       Q     Do you recall how accurate it was,

7    compared to what you actually found on the ground?

8       A     Specifically, I -- I don't remember.

9       Q     Okay.  What role, if any, did you play in

10   pre-raid planning for the October 2nd, 2013

11   operation?

12      A     The planning part?  None, I don't believe.

13      Q     Okay.

14      A     I was at the pre-raid meeting where we sat

15   down, this is who's going, this is what vehicles

16   we're going in, this is the order we're going to

17   enter the house.  But as far as the actual planning,

18   no.

19      Q     Okay.  So the pre-raid meeting you don't

20   really classify as a planning session?  It's more of

21   a briefing?

22      A     As far as my part of it, it was a

23   briefing.  I did not, per se, take place in the

24   actual planning.

25      Q     Okay.  Okay.  And am I fair to conclude

Ken Dulaney                                    January 24, 2017

Page 27

1   that you didn't have any -- you didn't make any of

2   the decisions about how the raid was to be

3   conducted?  Is that a fair conclusion?

4          A     Outside of general discussion, no.

5          Q     Okay.  Who did make those determinations?

6          A     All of that would have been made above my

7   pay grade, regardless of whether I was the case

8   agent or -- I mean, it would have been a -- we

9   discussed the situation.  Now, whether the sheriff,

10  the chief deputy, the major, I assume hashed those

11  details out as to exactly how we're going to carry

12  it out.

13         Q     Okay.  What role was assigned to you with

14  respect to the raid itself?

15         A     Entry.

16         Q     Okay.  So you were going to be part of the

17  entry team?

18         A     Yes.

19         Q     How many people were on the entry team?

20         A     I can't remember exactly.  Probably five.

21  But, there again, I'm operating solely off of a

22  three-and-a-half-year-old memory.  I'm sure probably

23  in my statement to MBI, when it was all fresh in my

24  mind, it may be more accurate as to how many people

25  were actually on the entry team.  I can't remember.

Ken Dulaney                                    January 24, 2017

Page 28

1       Q    That's fair.  Did you follow any standard

2    procedures, though -- did the entry team follow

3    standard procedures?

4       A    Can you clarify the question?

5       Q    Were there certain things that the entry

6    team did any time you executed a high-risk search

7    warrant?

8       A    I'm sure there were a lot of things we did

9    any time we operated -- you're going to have to be

10   more specific with the question.

11      Q    Okay.  Okay.  Where on the entry team did

12   you serve?  Which entrance to the building were you

13   assigned to and what position were you assigned to?

14      A    I was -- went to the front door, and I

15   think I was probably -- and there again, my -- my

16   statement right after the fact is, I'm sure, more

17   accurate than my memory.  I'm thinking three or

18   four.

19      Q    You were in the third or fourth position

20   going through the door?

21      A    I'm thinking that's right.

22      Q    By what mechanism did you -- was the door

23   forced?

24      A    Rammed.

25      Q    Okay.  Who wielded the ram?

Ken Dulaney                                    January 24, 2017

Page 29

1        A      To the -- to the best of my recollection,

2    I'm thinking it would have been Daniel Boyd; but,

3    there again, I'm sure my statement is more accurate

4    than my memory.

5        Q      What's the protocol for the ram man?  Does

6    he knock the door in?  Does he then go in the door

7    or does he stand aside?

8        A      He would have stood aside.

9        Q      Okay.  So he's not counted as number one;

10   right?

11       A      He's not the first man through the door,

12   no.

13       Q      Okay.

14       A      But for the purposes of where I'm at in

15   line going to the house, he would have been in the

16   lead.

17       Q      I gotcha.  Do you recall who the first man

18   through the door was?

19       A      I don't.

20       Q      What is your recollection of what your

21   assignment was once the front door of the building

22   was breeched?  What were you supposed to do?

23       A      Go through the common area of the house.

24   It would have been a bedroom immediately to the

25   right inside the door, to the best of my

Ken Dulaney                                         January 24, 2017

Page 30

1    recollection.  A common area just past that first

2    bedroom was what we'll call a hallway.  That was the

3    area I was going to.

4        Q    Okay.  So the bedroom that was to your

5    immediate right when you went through the door was

6    not your area of responsibility?

7        A    No.

8        Q    Okay.  Do you recall who was --

9        A    No.

10       Q    -- responsible for that area?

11       A    I don't.

12       Q    Okay.  So after you -- after the common

13   area was deemed clear, you proceeded through the

14   common area and down a hall?

15       A    As I proceeded through the door, we

16   encountered -- I don't know how many people --

17   numerous people in the common area of the house.

18       Q    Okay.

19       A    There was an agent there ordering them to

20   the ground.  I paused just long enough to see that

21   they were complying.  I proceeded on to that short

22   hallway area, and what was taking place behind me, I

23   don't know.

24       Q    Okay.  That was not your responsibility to

25   take those people down?

Ken Dulaney                                    January 24, 2017

Page 31

1        A     No.

2        Q     Okay.  All right.  So as I understand it,

3    you went to a hallway that was essentially directly

4    in front of you from the front door?

5        A     It would have been past the first bedroom

6    and to the right.

7        Q     Okay.  And the first bedroom is the one

8    that you previously described as being on the right?

9        A     Yes.

10       Q     Okay.

11       A     Well, it would have been -- you go through

12   the front door, there would have been a doorway to

13   the right.  Just past it is -- we're calling that a

14   hallway.  It's actually very short.  Then to what

15   ended up being a bedroom and a bathroom.

16       Q     All right.  How are your drawing skills?

17       A     Not very good.

18       Q     Would you mind diagramming it out for me?

19   Just do your -- do your best.

20       A     If you would have wanted a diagram the day

21   after it happened, I may could have done it; but

22   three-and-a-half years later, I don't know how

23   accurate my memory is.

24             (Witness drawing.)  There's some

25   stuff back here (indicating), I think, but I don't

Ken Dulaney                                    January 24, 2017

                                                     Page 32

 1   remember.

 2        Q    Okay.  If you will -- thank you for -- I'm

 3   sorry to put you on the spot like that -- like this,

 4   but it's helpful to me.  Would you mark the front

 5   door for me, and you can just use an "A" or a "1,"

 6   whatever you're comfortable doing.

 7        A    (Witness complying.)

 8        Q    Okay.  You've marked the front door, then,

 9   with a "1."  Okay.

10        A    Yeah.

11        Q    And then show me the front bedroom that

12   you were describing.

13        A    This would have been a doorway on the

14   right (indicating).

15        Q    Okay.  And just mark that front bedroom

16   with a "2," then.

17        A    Uh-huh.  (Witness complying.)

18        Q    Would you mark it with a "2," please?

19        A    I did.

20        Q    Oh, I'm sorry.  I didn't -- okay.  And so

21   you marked the doorway to the second bedroom with a

22   "2"?

23        A    Yeah.

24        Q    Okay.  And then did you draw the hall that

25   you were describing earlier, the short little

Ken Dulaney                                          January 24, 2017

Page 33

1    hallway?

2         A    Yes.

3         Q    And -- okay.  Would you mark it with a

4    "3."

5         A    (Witness complying.)

6         Q    Okay.  And then the door at the end of the

7    hallway, is that the door to the room where my

8    client was asleep?

9         A    No.

10        Q    Okay.  Show me the door that went to the

11   room where my client was asleep.

12        A    (Witness drawing.)

13        Q    Okay.  What did you just mark that with?

14        A    "5."

15        Q    A "5."  Okay.

16        A    This is "4."

17        Q    Okay.  What is "4," then?

18        A    It's a small bathroom.

19        Q    Okay.  All right.  So "1" is the front

20   door, "2" is the doorway to the first bedroom, "3"

21   is the short hallway, "4" is the bathroom, and "5"

22   is the doorway to the bedroom where my client was

23   located.

24        A    This doorway is actually -- that door is

25   actually kind of recessed, to the best of my --

Ken Dulaney                                  January 24, 2017

Page 34

1      Q    Okay.

2      A    -- recollection.

3      Q    Okay.  All right.  Do you recall -- did

4    you have a pretty clear understanding that that's

5    where you were headed before you went into the

6    building, or were you just generally supposed to go

7    in that direction and clear that part of the house?

8      A    It's -- we came through the door.  There

9    should have been somebody ahead of me that would

10   have taken the first doorway to the right.  Somebody

11   would have cleared this common living area here

12   (indicating).  I would have proceeded on to the next

13   opening (indicating).

14     Q    Okay.  All right.  Were you -- was anybody

15   assigned to go with you on the duty to clear the

16   openings to the right?

17     A    There may have very well been, but all of

18   this stuff is happening in a matter of seconds.

19     Q    Yes, sir.

20     A    And it's all fluid.  The best laid plans

21   change as you encounter stuff within the house.

22     Q    Okay.  Okay.  As a practical matter,

23   did -- was there another agent with you?

24     A    There was a -- there was another agent

25   that came behind me at some point, but I think he

Ken Dulaney                                    January 24, 2017

Page 35

 1   held up --

 2        Q     Okay.

 3        A     -- briefly in this common living area

 4   (indicating).

 5        Q     Okay.  Who was that?

 6        A     I think it was Agent Mercado.

 7        Q     Okay.  Macada?

 8        A     Mercado.

 9        Q     Mercado.  Okay.  Thank you.  And -- okay.

10   Did you check the bathroom door?

11        A     Yes.

12        Q     Was it opened or closed?

13        A     To the best of my recollection, it was

14   opened.

15        Q     Okay.

16        A     But looking into this doorway

17   (indicating), I want to say as you enter the doorway

18   to the left, there was a bathtub set back to the

19   left, maybe a sink or something on the other side.

20   I can't remember.  I could see straight into the

21   doorway, but to clear the whole bathroom, I

22   physically had to go through the door, clear the

23   bathtub area, come back out.

24        Q     Okay.  And you did that before you went to

25   the doorway that you've marked as Area Number 5 on

Ken Dulaney                                    January 24, 2017

                                                    Page 36

1    your chart?

2        A    That's correct.

3        Q    Okay.  On your diagram, I mean.  Okay.

4    All right.

5             MR. MALTA:  Do either of you have an

6        objection to marking this as an exhibit?

7             MR. WOLF:  No.

8             MR. THAGGARD:  No.

9             MR. MALTA:  Okay.

10                    (Exhibit 2 was marked.)

11   BY MR. MALTA:

12       Q    All right, Agent Dulaney.  After you

13   assured yourself that the -- the bathroom was

14   cleared; right?

15       A    It was.

16       Q    Okay.  After you assured yourself that no

17   one was in the bathroom, to where did you turn your

18   attention?

19       A    Back to this doorway (indicating).

20       Q    Okay.  And you're indicating on diagram --

21   or excuse me.  On Exhibit Number 2, you're

22   indicating the doorway that you've marked as

23   Number 5?

24       A    That's correct.

25       Q    Okay.  And where was Agent Mercado at the

Ken Dulaney                                    January 24, 2017

Page 37

1    point that you refocused your attention on Doorway

2    Number 5?

3         A    He was not there.  I'm assuming he was

4    still in the common area of the living room.

5         Q    Okay.  Was there -- were there any agents

6    in your immediate area?

7         A    No.

8         Q    Okay.  All right.  Did you test the

9    doorway number -- that you've marked as Number 5?

10        A    Test it as...

11        Q    Did you try to open it?

12        A    I checked -- trying to be quiet, I tried

13   to check to see if it was locked.  I believed it to

14   be locked.

15        Q    Okay.  What led you to believe it was

16   locked?

17        A    That -- I turned the doorknob and it

18   didn't move.

19        Q    Okay.  Did you announce yourself?

20        A    We kicked the front door.  We were

21   announcing ourself all the way through the house.

22        Q    Okay.  Did you announce yourself?

23        A    I'm sure I did.

24        Q    Okay.  But you don't recall specifically?

25        A    I'm sure I announced myself.  Yes.

Ken Dulaney                                    January 24, 2017

Page 38

1       Q    Okay.  In what manner did you commonly

2   announce yourself?

3       A    Sheriff's office.

4       Q    Okay.  Okay.  And -- all right.  When you

5   found the door closed -- Door Number 5, we're going

6   to -- I'm going to call it, if you don't mind --

7   what did you do?

8       A    I kicked the door open.

9       Q    Okay.  All right.  We'll come back to

10  that.  Let me ask you about your weapon.

11      A    Okay.

12      Q    What kind of -- what kind of firearm were

13  you carrying that day?

14      A    A Glock 21.

15      Q    Okay.  I've heard it described as a

16  Generation 1.  Is that -- is that a fair

17  description?

18      A    I don't believe it would have been a

19  Gen 1.

20      Q    What was it, then?

21      A    I believe -- I want to say it was a Gen 3.

22      Q    Okay.  What caliber weapon is that?

23      A    Forty-five ACP.

24      Q    Okay.  And that's a semiautomatic pistol?

25      A    Yes.

Ken Dulaney                                    January 24, 2017

                                                        Page 39

1        Q    Okay.  How long did you carry that

2   particular weapon?

3        A    Probably six years.

4        Q    Okay.

5        A    Somewhere thereabouts.

6        Q    Okay.  So you probably first trained on

7   the Glock 21 in 2005 or '06?

8        A    All right.  Are you talking about that

9   particular weapon or that particular model weapon?

10       Q    Well, actually your -- thank you for

11  correcting me, because I did ask you about that

12  particular weapon.  Let me -- let me ask you about

13  that -- that type of weapon.  When did you first

14  become familiar with and train on a Glock 21?

15       A    In 2000.

16       Q    Okay.  And when did you start carrying

17  Glock 21s?

18       A    In 2000.

19       Q    Okay.  So you had carried a Glock 21 for

20  about 13 years at the time of this raid?

21       A    Yes.

22       Q    Okay.  And you had carried this particular

23  weapon that was involved in the shooting for how

24  long?

25       A    Maybe six years.

Ken Dulaney                                          January 24, 2017

Page 40

1       Q     Okay.  All right.  And had that weapon
2    been modified?
3       A     No.
4       Q     Okay.  Had the weapon been inspected?
5       A     It was periodically inspected.
6       Q     Who inspected it?
7       A     At which time?  I --
8       Q     Well, when you say "it was periodically
9    inspected," what would -- under what periods of
10   time?  Was there a -- was there a -- was there
11   specific -- was there a specific time frame in which
12   the weapon was supposed to be inspected?
13      A     I don't recall.  And as accreditation
14   changed things and policy changes, I mean, it could
15   have changed.  I really don't recall.
16      Q     Okay.
17      A     But an armorer -- an armorer would have
18   inspected it.
19      Q     Okay.
20      A     The last person that inspected it, I
21   think, was Lieutenant Ruston Russell, I believe.
22      Q     Approximately when would that have
23   occurred?
24      A     I don't recall.
25      Q     When you say the last person who inspected

Ken Dulaney                                    January 24, 2017

Page 41

1    it, that would be the last time preceding the

2    incident that occurred on October the 2nd, 2013?

3        A    I can't remember if that was right before

4    or right after, but the last departmental weapon

5    inspection that I can remember going to, I believe

6    Lieutenant Russell inspected it.  Now, exactly when

7    that was, I can't tell you.

8        Q    Okay.  Do you recall any other

9    departmental weapons inspections other than that

10   one?

11       A    Sure.  But I can't tell you who -- who did

12   them.

13       Q    Okay.  Should there be documentation of

14   those inspections?

15       A    There is an inspection form.

16       Q    Okay.  How often did you have to

17   periodically certify on the Glock 21?

18       A    You're talking about qualifications?

19       Q    Yes.  To qualify.

20       A    Twice a year.

21       Q    Okay.  And were you current on October the

22   2nd, 2013, as far as you recall?

23       A    Yes.

24       Q    Okay.  And where had you qualified?  On

25   the -- on the sheriff's range?

Ken Dulaney                                    January 24, 2017

Page 42

 1      A    Yes.

 2      Q    Okay.

 3      A    Or wherever we were holding departmental

 4 qualifications at the time.  Sometimes that was at

 5 Sandflat and sometimes at Modern Outfitters.

 6      Q    Okay.  What was the policy or what was the

 7 protocol that you were supposed to follow with

 8 regard to safety, to safely handle your weapon

 9 during a high-risk -- during the service of a

10 high-risk search warrant?

11      A    Can you be more specific with the

12 question?

13      Q    Sure.  Does that particular weapon have a

14 safety catch?

15      A    A external manual safety, no.

16      Q    Okay.

17      A    Internal safety mechanisms, yes.

18      Q    What is -- describe the internal safety

19 mechanism that's featured on that weapon for me,

20 please.

21      A    I'm not a firearms engineer.  I'm telling

22 you there are safety mechanisms engineered into the

23 firearm.  It does not have a external safety

24 mechanism.

25      Q    Okay.  What's your understanding of how

Ken Dulaney                                    January 24, 2017

                                                     Page 43

1   the internal safety mechanism works?  What does it

2   do?  Does it make the trigger harder to pull or what

3   does it do?

4        A    There is a lever on the front of the

5   trigger that allows the trigger to move rearward

6   and -- there again, I'm not a firearms engineer.

7   A -- I want to say a firing pin safety block.

8        Q    Okay.  All right.  So since there's no

9   safety catch on the weapon, what -- how are you

10  supposed to handle the weapon when you're executing

11  a high-risk search warrant?

12       A    The firearm would have been in my hand, my

13  finger indexed along the side of the frame and the

14  muzzle pointed in the safest direction possible.

15       Q    Okay.  And when you describe your finger

16  being indexed along the frame of the weapon, that's

17  your trigger finger?

18       A    Yes.

19       Q    On your dominant hand?

20       A    Yes.

21       Q    What's your dominant hand?

22       A    Right.

23       Q    Okay.  The trigger finger of your right

24  hand.  And that would be outside the trigger guard;

25  correct?

Ken Dulaney                                    January 24, 2017

Page 44

1        A    Yes.

2        Q    Okay.  And what's your understanding of

3   the protocol for handling the weapon on -- in the

4   type of circumstances that you've been describing to

5   me, with regard to how many hands you use?  Are you

6   supposed to use two hands if you can?

7        A    If -- we're taught to shoot one-handed.

8   We're taught to shoot with both hands.

9        Q    Is there a preference?

10       A    Depending on the situation.

11       Q    Is there a -- is there a training -- are

12   you trained that it's preferable to do one or the

13   other, unless the situation dictates otherwise?

14       A    Unless the situation dictates otherwise, I

15   generally shoot two-handed, if that answers your

16   question; but we're taught to shoot either

17   one-handed or two-handed.

18       Q    That answers my question.  As I understand

19   it, your preference is, if you can, you want to use

20   both hands?

21       A    Yes.

22       Q    Okay.  And is it fair for me to say that

23   that's true for most officers?  Don't most officers

24   want to use two hands, unless there's some reason

25   not to?

Ken Dulaney                                    January 24, 2017

Page 45

1              MR. THAGGARD:  Object to form.

2    BY MR. MALTA:

3         Q    In your experience.

4              MR. THAGGARD:  Same objection.

5    BY MR. MALTA:

6         Q    You can answer the question.

7         A    I would say, in my experience, officers

8    generally shoot two-handed unless they are otherwise

9    occupied.

10        Q    Okay.  Unless there's a reason not to; is

11   that fair?

12        A    Or unless they're instructed not to.

13        Q    Okay.  All right.  You didn't receive any

14   instructions on how to hold or use your weapon on

15   October the 2nd, 2013, did you?

16             MR. WOLF:  Object to the form.  It's sort

17        of a vague question.

18             MR. MALTA:  Okay.  I'll --

19             MR. WOLF:  Are you talking about that

20        night, were you given additional instructions?

21        That sort of --

22             MR. MALTA:  Let me -- let me rephrase the

23        question.

24             MR. WOLF:  Yeah.

25

Ken Dulaney                                          January 24, 2017

Page 46

1    BY MR. MALTA:

2        Q    On October the 2nd, 2013, you were relying

3    on training that you had received.  You didn't

4    receive any specific instructions that day, "Okay,

5    Agent Dulaney.  This is the way you're to hold your

6    gun."  You didn't --

7        A    No.

8        Q    Nobody told you anything like that; did

9    they?

10       A    No.

11       Q    Okay.  You're relying on your training up

12   to that point; correct?

13       A    Yes.

14       Q    Okay.  And as you've entered the building

15   as you've already described, and you've already

16   taken us through your going into the building and

17   through the front common area and into the short

18   hallway, how do you recall you were holding your

19   weapon?

20       A    At what point?

21       Q    Throughout that period of time.

22       A    I would say probably at -- with both hands

23   at a ready gun until I came to that doorway.

24   Obviously, if I checked the door to see if it was

25   locked, at some point it was in one hand.  I was

Ken Dulaney                                    January 24, 2017

Page 47

1    using the other hand to check the door.

2         Q    Do you recall which?

3         A    No.  I don't.  When I kicked the door and

4    started through, I don't recall.

5         Q    Okay.  So did you kind of back up to

6    execute the kick on the door?  Do you remember?

7         A    I don't.

8         Q    Okay.  When you did kick the door, do you

9    recall how you were holding the weapon at the time

10   you kicked the door?

11        A    I don't.

12        Q    Okay.  What does your training dictate?

13   How are you supposed to hold your weapon when you're

14   forcing a door in that manner?

15        A    Generally, when I -- if I was going to

16   kick the door, the gun would be down to my side

17   (demonstrating), pointed straight down toward the

18   floor, as I was kicking the door.

19        Q    Okay.  And you're -- you're indicating

20   with your body that you're holding it in one hand,

21   in your dominant hand, down along your right -- the

22   side of your right hip?

23        A    I would -- there again, I don't remember

24   exactly what I did.

25        Q    Yeah.  My question isn't -- I understand

Ken Dulaney                                        January 24, 2017

Page 48

1   you don't remember and I'm not criticizing you for

2   that.  My question is:  What would you normally do?

3   And I understand you to say that you would normally

4   hold the gun in your right hand, facing the floor

5   down along your right hip; is that accurate?

6       A    Yes.  And my reasoning would have been as

7   I come up and kicked the door, if I've got the gun

8   up here, now the gun is pointed at --

9       Q    At you.

10      A    -- that either/or leg.

11      Q    I understand.  Okay.  I understand.

12  And -- all right.  So you don't recall what hand or

13  if what -- if you had the gun in both hands at the

14  time you kicked the door?

15      A    Just -- I just said that when -- as I

16  kicked the door, the gun probably would have been in

17  my right hand to my right side.

18      Q    Okay.  All right.  And pointing down at

19  that point?

20      A    Yeah.

21      Q    Okay.  All right.  And then after you

22  kicked the door open, what, if anything, did you do

23  with your hands?

24      A    I'm sure I would have came back up to

25  proceed through the doorway (demonstrating).

Ken Dulaney                                      January 24, 2017

Page 49

1       Q    Okay.  And you're indicating that you

2    would have come back up -- brought your gun back up

3    to chest level or thereabouts in both hands?

4       A    Yes.

5       Q    Is that what you think happened?

6       A    There again, I don't remember this.

7       Q    Okay.  Do you recall talking to the

8    investigating officers and the sheriff separately

9    about switching hands?

10      A    I really don't.

11      Q    Okay.

12      A    And this is -- there again, this is all

13   happening in a matter of seconds.  And I'm trying to

14   process in my mind right after all -- everything

15   there happened, with everything running together,

16   I -- I may have said something about switching

17   hands, may not.  I don't recall.  I may have swapped

18   hands to check the door and then swapped back.  I

19   don't recall.

20      Q    The gun discharged because you pulled the

21   trigger; right?  Is that correct?

22           MR. WOLF:  Object to the form.

23   BY MR. MALTA:

24      Q    Why did the gun discharge?

25      A    I would say the gun discharged because the

Ken Dulaney                                    January 24, 2017

                                                        Page 50
 1    trigger was depressed.

 2        Q    Okay.  And you depressed the trigger;

 3    right?

 4        A    Unintentionally, yes.

 5        Q    Okay.  And I'm not saying that you did it

 6    intentionally.

 7        A    Okay.

 8        Q    I'm just asking, it was your finger that

 9    pressed the trigger; correct?

10        A    That would be correct.

11        Q    Okay.  And would it have been your regular

12    right index finger or do you recall?

13        A    It would have probably been my regular

14    right index finger.

15        Q    Okay.  All right.  And how do you account

16    for your regular right index finger traveling from

17    outside the trigger guard inside the trigger guard

18    to pull the trigger?

19        A    As I was going through the doorway, I hung

20    my foot in the threshold of the doorway.

21        Q    Okay.

22        A    I stumbled forward.  I did not fall.  I

23    lost -- I did not fall to the ground.  I lost my

24    balance.  My only account for it is that it is a

25    sympathetic response of the body, as you start to

Ken Dulaney                                    January 24, 2017

Page 51

1    fall, to try to catch yourself or to clench.

2         Q    Okay.  All right.  So you're thinking that

3    as a sympathetic response, you clenched your right

4    hand and the -- and your finger engaged the trigger?

5         A    You -- I don't know.  That is my only

6    thinking in my mind that's what caused it.

7         Q    Okay.  I'm just wondering if your -- if

8    your finger was where it was supposed to be, indexed

9    along the frame of the weapon outside of the trigger

10   guard, if you had a involuntary sympathetic response

11   and clenched your finger, wouldn't it clench on the

12   outside of the trigger guard?

13        A    Don't know.

14        Q    I mean, that's what the trigger guard is

15   for, correct, is to -- is to prevent an accidental

16   discharge; is that correct?

17        A    I would say that would be correct.

18        Q    Okay.  So your memory today is that you

19   don't recollect, as you were going through the door,

20   switching gun hands; is that right?

21        A    No.

22        Q    Okay.  What did you see in the room as you

23   kicked open the door?

24        A    The room was very dimly lit.  I think I

25   heard MBI say, after the fact, there may have been a

Ken Dulaney                                    January 24, 2017

Page 52

1    black light on in the room.  I don't remember.

2    There was a -- to the best of my recollection, more

3    or less an open area to the left.  There was a bed

4    turned, it seems like, at an angle inside the

5    doorway.  The room was fairly small.  But as far as

6    Ms. Dunn, I never perceived her to be there.

7         Q    Okay.  And is it also fair for me to

8    conclude that you didn't perceive any specific

9    threat from the bedroom when you kicked in the door?

10        A    I didn't perceive a -- outside of the

11   inherent threat of running the high-risk warrant, as

12   far as her in particular, I did not even perceive

13   her to be in the room.  Therefore, no, I cannot

14   perceive a threat from her.  I never saw her.

15        Q    Okay.  All right.  So you weren't

16   responding to a sudden movement or any other kind of

17   threat like that.  You just -- you just fell?

18        A    I never perceived her to be there until

19   after the discharge.

20        Q    Okay.

21        A    And then I could not physically see her.

22   All I could see was the bedding on the cover start

23   to come -- the cover on the bedding start to come

24   forward.

25        Q    Okay.  At what point did you realize you

Ken Dulaney                                    January 24, 2017

Page 53

1   had shot her?

2        A     Not until after I had placed her in

3   handcuffs.  After the discharge, after I saw the

4   movement, I immediately went to her, tried to make

5   sure she wasn't injured.  I checked her as quickly

6   as I could inside the room.  I didn't see any

7   physical injury.  I asked her if she was all right.

8   I believe she said, "My hand is cramping."  She was

9   already in handcuffs at that time.  I checked her

10  again, tried to make sure she wasn't injured.  I did

11  feel a little bit of blood on my hand.  Once I saw

12  that, I immediately took her out the front door of

13  the residence.  Major -- or excuse me -- Chief

14  Deputy Calhoun was standing in the yard.  I went

15  straight to him, explained to him what happened.  He

16  immediately called an ambulance, and within just a

17  couple of minutes the ambulance was there.

18       Q     Okay.  Did you place Ms. Dunn in handcuffs

19  in front of her back or -- I mean, in front of

20  her -- in front of her torso or behind her back?

21       A     Behind her back.

22       Q     Okay.  And when did you realize that she

23  had been shot?

24       A     Like I said, I -- I checked her as soon as

25  I got her up, made sure I didn't see any blood or

Ken Dulaney                                    January 24, 2017

                                                   Page 54

 1  anything.  I didn't see any, put her in handcuffs.

 2  She again said something about her hand cramping.  I

 3  checked her again, as best I could in that -- in

 4  that room.  I still couldn't actually see a wound,

 5  but I did have blood on my hand.

 6       Q    Okay.

 7       A    At that point I carried her straight out

 8  the door.

 9       Q    Okay.  So at the time you found blood on

10  your hand, did you -- you knew she had been wounded?

11       A    Yes.

12       Q    Okay.  Okay.

13       A    Or I assumed she had been wounded.

14       Q    Okay.  Okay.  I've noticed in the

15  deposition today that your right middle finger seems

16  to be bent.  Is that a -- when did -- is that as a

17  result of an injury?

18       A    Yes.

19       Q    When did that occur?

20       A    2007 maybe.

21       Q    Okay.  Is that -- so I'm assuming that's a

22  permanent --

23       A    It is.

24       Q    That finger is, like, frozen in a

25  permanent position?  Is it a --

Ken Dulaney                                    January 24, 2017

Page 55

1        A     Well, it will move.

2        Q     Okay.

3        A     It only has limited movement

4   (demonstrating).

5        Q     Okay.  Does the limited movement in your

6   middle finger -- and I understand that's not your

7   trigger finger, but it is your dominant hand; right?

8        A     Yes.

9        Q     Does it affect your ability to hold a

10  sidearm?

11       A     No.

12       Q     Okay.

13       A     Actually, it's just the opposite.  If I

14  had it fixed, it would be fused straight, which

15  would interfere with my ability --

16       Q     Okay.

17       A     -- to grab and hold a firearm.  As it is,

18  that's where your hand normally ends up anyway

19  (demonstrating).  So, no, it doesn't.

20       Q     Okay.  So you don't think that that --

21  that that condition contributed to cause the

22  incident that we're talking about today?

23       A     No.

24       Q     Okay.  After this negligent discharge that

25  you described, what became of the firearm?

Ken Dulaney                                          January 24, 2017

                                                              Page 56

1        A     It was taken from me on the scene by --
2    excuse me -- by Major Greg Lea.  Where it went from
3    there, I'm assuming it went to MBI.
4        Q     Mississippi Bureau of Investigations?
5        A     Yeah.
6        Q     Okay.  Did you ever see the gun again?
7        A     Yes.  It -- I can't remember how long it
8    was gone.  For a period of time.  I assume they
9    brought it back to the sheriff's department and it
10   was reissued back to me.
11       Q     Okay.  And then you carried it in-service
12   again for some period of time?
13       A     Yes.
14       Q     Okay.  And then at what point -- let me
15   strike that and ask you this.  I understand from
16   talking to your attorney that the gun did not belong
17   to you, as it sometimes does in some agencies, but
18   that it was a true department-issued firearm; is
19   that true?
20       A     It was.
21       Q     Okay.  And at what point was that firearm
22   turned back in to the department?
23       A     As far as a date, I couldn't tell you.  I
24   believe --
25       Q     Can you approximate for me?

Ken Dulaney                                    January 24, 2017

Page 57

1       A     I really can't.  Probably, I would say,

2   over a year ago.

3       Q     Over a year what?

4       A     Ago.

5       Q     A year ago from now?

6       A     I would -- there again, I don't remember

7   specifically.

8       Q     Okay.

9       A     I know the department changed out their

10  arsenal weapons.  The old weapons were traded in to

11  whoever they bought the new weapons from.  And once

12  I turned it back into the department, I assume it

13  went to whoever bought them.

14      Q     Okay.  So that weapon was exchanged for

15  another one, as far as you understand it?

16      A     Yes.

17      Q     Okay.

18      A     Traded in on.

19      Q     Okay.  What was the new weapon that was

20  issued to you?

21      A     My Glock 21.

22      Q     And --

23      A     Gen 4.

24      Q     I'm sorry?

25      A     Gen 4.

Ken Dulaney                                    January 24, 2017

Page 58

1        Q    A Gen 4.  Okay.

2                  All right.  Were you offered an

3    opportunity to buy the old Gen 3?

4        A    I was.

5        Q    And you declined that opportunity?

6        A    I did.

7        Q    Okay.  So as far as you know, it's gone

8    back to the distributor?

9        A    Yes.

10        Q    Okay.  Did you ever see any documentation

11    of any inspection of the weapon conducted by MBI?

12        A    I did not.

13        Q    Okay.  I understand that the weapon might

14    have gone to the crime lab.  Did you ever see any

15    crime lab report related to an assessment or

16    inspection of the weapon?

17        A    I didn't.

18        Q    Okay.  Did anybody ever tell you that it

19    was inspected by the crime lab?

20        A    No.

21        Q    Okay.

22        A    I just assumed that it -- there again,

23    that's my assumption.  Now, when it was taken from

24    me, it went to MBI and they -- they did some sort of

25    inspection on it.  I don't know.

Ken Dulaney                                        January 24, 2017

                                                        Page 72

1                    REPORTER'S CERTIFICATION

2                    DEPOSITION OF KEN DULANEY

3                      JANUARY 24, 2017

4         I, Megan Reeves, CCR, Court Reporter and Notary at
     Large in and for the State of Mississippi, do hereby
5    certify that the foregoing pages, and including this
     page, contain a true and correct transcript of the
6    testimony of the witness, as taken by me at the time and
     place heretofore stated in the aforementioned matter, by
7    machine shorthand with electronic verification, with
     assistance of computer-aided transcription, to the best
8    of my skill and ability.

9         I further certify that I placed the witness under
     oath to truthfully answer all questions in this matter
10   under the authority vested in me by the State of
     Mississippi.
11
          I further certify that I am not in the employ of, or
12   related to, any counsel or party in this matter, and have
     no interest, monetary or otherwise, in the final outcome
13   of this proceeding.

14        Witness my seal and signature on this 7th
     day of February, 2017.
15

16

17

18   _____

19        Megan Reeves, CCR
          Notary Public
20        My Commission Expires:  2-5-2018
          Bowers Court Reporting, LLC
21        4521 Poplar Springs Drive
          Meridian, Mississippi 39305
22
          Mailing Address:
23        Post Office Box 3095
          Meridian, Mississippi 39303
24        (601) 693-6677

25